## COMMONWEALTH *vs.* RAYMOND MILLS.

Middlesex.   April 6, 1987. — August 12, 1987.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Insanity. Practice, Criminal,* Instructions to jury, Presumptions and burden of proof. *Evidence,* Insanity.

On appeal from convictions of armed assault with intent to murder, mayhem, and assault and battery by means of a dangerous weapon, this court concluded that the evidence, including the defendant's own testimony as to his state of mind at the time he stabbed the victim, together with other testimony concerning the defendant's conduct on the day of the crimes, would have warranted the jury in finding a reasonable doubt as to whether the defendant was criminally responsible, and, consequently, that it was reversible error for the judge to decline to instruct the jury on criminal responsibility after the defendant requested that he do so. [630-632] O'CONNOR, J., with whom NOLAN & LYNCH, JJ., join, dissenting.

INDICTMENTS found and returned in the Superior Court Department on May 2, 1985.

The cases were tried before *James D. McDaniel, Jr.,* J.

The Supreme Judicial Court granted a request for direct appellate review.

*Maureen B. Brodoff,* Committee for Public Counsel Services, for the defendant.

*Karen J. Kepler,* Assistant District Attorney, for the Commonwealth.

WILKINS, J. The defendant has raised one issue on his appeal from his convictions of armed assault with intent to murder, mayhem, and assault and battery by means of a dangerous weapon. He challenges the judge's decision, over the defendant's objections, not to charge the jury on the issue of his criminal responsibility.[1] We conclude that the question is a

[1] The defendant expresses the argument in terms of his rights under the State and Federal Constitutions, specifically the restriction on his right to

close one but that the defendant is correct. The evidence did permit a reasonable doubt concerning the defendant's criminal responsibility.

For the past twenty years, this Commonwealth has followed the rule on criminal responsibility set forth in § 4.01 (1) of the Model Penal Code, at 66 (Proposed Official Draft 1962). *Commonwealth* v. *McHoul*, 352 Mass. 544, 547 (1967). That section states that "[a] person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." For the first ten years of the *McHoul* rule, we decided no case presenting the question whether the evidence was sufficient to require a judge to instruct according to that rule. See *Commonwealth* v. *McInerney*, 373 Mass. 136, 151 (1977). In the past ten years, however, we have had a number of such cases. In some, we have concluded that, if requested, an instruction on criminal responsibility was required on the evidence, and, in others, that no instruction was required. See *Commonwealth* v. *Monico*, 396 Mass. 793, 800-801 (1986) (instruction required; new trial ordered); *Commonwealth* v. *Genius*, 387 Mass. 695, 697-698 (1982) (instruction would have been required, if requested), collecting cases on each aspect.

"An insanity defense may be raised properly by the admission of any evidence which, if believed, might create a reasonable doubt concerning the defendant's criminal responsibility at the time of the [crime]." *Commonwealth* v. *Laliberty*, 373 Mass. 238, 246-247 (1977).[2] Expert testimony is not requiired to raise

present a defense, citing art. 12 of the Massachusetts Declaration of Rights and the Sixth and Fourteenth Amendments to the Constitution of the United States. We have not previously discussed the "insanity defense" in such constitutional terms, and see no need to do so in this case.

[2] The dissent espouses a radically new standard for testing whether an instruction on lack of criminal responsibility should be given. It asserts that such an instruction need be given only if the evidence would warrant "a finding by a fair preponderance of the evidence that the defendant was

the issue. See *Commonwealth* v. *Monico, supra* at 798; *Commonwealth* v. *Laliberty, supra* at 245. "The issue may arise from the facts of the case, through the Commonwealth's witnesses, through lay testimony, or any combination thereof." *Commonwealth* v. *Monico, supra.* See *Commonwealth* v. *Mattson*, 377 Mass. 638, 644 (1979). The facts of the crime may be considered in support of an insanity defense. See *Commonwealth* v. *Laliberty, supra; Commonwealth* v. *Costa*, 360 Mass. 177, 182 (1971) (in addition to expert testimony, "bizarre nature of the killings" also offered as evidence of insanity); *Commonwealth* v. *Francis*, 355 Mass. 108, 111 (1969) ("it is for the jury to determine on all the evidence whether what was done was itself evidence of insanity at the time of the act").

Although we have said that a defendant "might argue that the very facts of the alleged crime create an inference of mental disease or defect" (*Blaisdell* v. *Commonwealth*, 372 Mass. 753, 765 [1977]), no case based solely on the facts of the crime has come before us in which we have reversed a conviction for failure to give a *McHoul* charge. See *Commonwealth* v. *Harris*, 387 Mass. 758, 763 (1982) (allegedly bizarre nature of particular crimes "would not, standing alone, have been sufficient evidence of lack of criminal responsibility to raise a jury issue"; defendant claimed ineffective assistance due to counsel's failure to investigate insanity defense); *Osborne* v. *Commonwealth*, 378 Mass. 104, 111 (1979) ("senseless crime alone does not entitle the defendant to a jury instruction on criminal responsibility"; ineffective assistance claimed); *Commonwealth* v. *Mattson, supra* (court can find no case "where the inexplicableness of a crime alone raises a jury issue of insanity").

We recite the evidence on which the defendant relies in arguing that the jury could properly have had a reasonable doubt concerning his criminal responsibility. The defendant and

insane at the relevant time." *Post* at 632. That is not the test for deciding whether the evidence might create a reasonable doubt.

There will be cases, contrary to the dissent's observation, in which a defendant will not be entitled to an instruction on lack of criminal responsibility.

the victim had been living together (with her children) in an apartment in Marlborough prior to the day of the alleged crimes. On March 9, 1985, the day before the defendant stabbed the victim, the two had had a serious disagreement whether they would attend a party. He did not want her to attend because her former "common law" husband might be there. They did not attend the party. The quarrel continued the next morning. The victim's daughter called the police. The two police officers who responded persuaded the defendant to leave the apartment and arranged for the victim to come to the police station later to obtain a temporary restraining order. Immediately, when the police had left the apartment, the defendant returned and assaulted the victim. The police officers heard the noise, and they too returned. The defendant resisted arrest and ran away. The officers went looking for him and were summoned back to the premises by radio because the defendant had again returned. The defendant violently resisted arrest once again, while crying and calling the victim's name, but was ultimately handcuffed, after an officer sprayed the chemical Mace on him. He was taken to a cruiser and then to the police station, resisting and screaming all the way. The victim came to the police station and obtained from a judge a restraining order against the defendant which was explained to him. He was released about 9:30 A.M. and immediately attempted to find the victim and communicate with her. Around 2 P.M., the defendant got out of an automobile on Hosmer Street at the same time the victim, one of her daughters, and two other women were walking there. The defendant crossed the street, paying no heed to the traffic, confronted the women, and said he wanted to talk with the victim. She said that she had nothing to say. He asked again. She refused and tried to walk away. He took a knife from his jacket and stabbed her in the back. She fell and he landed on top of her, repeatedly trying to stab her and saying that he was going to kill her and that he was going to go to jail. Others came to the victim's aid. At one point the knife broke, but the defendant continued to stab at the victim. His body was stiff, and he appeared to be insensitive to pain, even when kicked in the face. The defendant fled the

scene and was arrested shortly thereafter. He told an arresting officer to shoot him and that "I want you to kill me." He again violently resisted arrest and had to be subdued with Mace. Once in a cell at the police station, the defendant remained extremely emotional, agitated, and shaking.

At trial, the defendant testified that he had consumed alcoholic beverages after his release from the police station in the morning. He said that he looked for the victim because he "was a desperate man" and that he discovered where the victim was supposed to be. He testified that, when he confronted the victim on the street and she declined to speak with him, "I just stabbed her." His mind went blank, he said, and, although he did not remember stabbing her and did not want to stab her, he now knew he had. He did not remember being pulled from the victim, running from the scene, or, upon arrest, asking the police officer to kill him. On cross-examination, the defendant testified that he had a history of alcoholism but not a history of mental illness.

The defendant sought to raise his lack of criminal responsibility as a jury question.[3] The judge declined to give such an instruction and ordered defense counsel not to argue the issue to the jury.

This court's view has consistently been that "[w]here the appropriateness of an insanity instruction is marginal, the better choice would seem to be to err on the side of giving it, since the Commonwealth has the ultimate burden of proving the defendant sane beyond a reasonable doubt, and the jury are 'the sole judge[s] of this factual issue.' *Commonwealth* v. *Smith*, 357 Mass. 168, 180 (1970)." *Commonwealth* v. *Mattson*,

---

[3] The Commonwealth was on notice before trial that the defendant intended to rely upon the defense of lack of criminal responsibility. The pretrial conference report, filed five months before trial, shows that notice was given. At the pretrial motion hearing defense counsel stated his intention to rely on the defense without the aid of expert testimony, and the prosecutor twice stated that he had received notice of the defendant's intent to rely on the defense of lack of criminal responsibility. Thus, there is no issue whether the defendant complied with the notice requirement of Mass. R. Crim. P. 14 (b) (2) (A), 378 Mass. 874 (1979). The Commonwealth could, of course, have moved for an examination of the defendant.

377 Mass. 638, 644 (1979). See *Commonwealth* v. *Monico, supra* at 802. This is a close case which on its facts falls between *Commonwealth* v. *Mattson, supra* at 643-644, in which a criminal responsibility charge was not required,[4] and *Commonwealth* v. *Laliberty*, 373 Mass. 238, 246 (1977), in which such a charge would have been required, if requested.[5]

Based on that evidence, we conclude that the jury would have been warranted in concluding that there was a reasonable doubt concerning the defendant's criminal responsibility. That evidence, which includes the defendant's testimony as to his state of mind at the time of the stabbings, raised the possibility that he lacked substantial capacity to "conform his conduct to the requirements of law," one of the alternatives in the second aspect of the *McHoul* test.

The remaining question is whether there was evidence, warranting a reasonable doubt, that the defendant's inability to conform his conduct to the requirements of law was caused by a mental disease or defect. Although there is no direct evidence that the defendant had or has had any mental problem, a reasonable doubt that the defendant might be suffering from a mental disease or defect would have been warranted on the evidence. His conduct on that day could well simply have been based on anger, jealousy, and frustration which ultimately he took out on the focus of these emotions. But the defendant's preassault conduct (irrationally resisting arrest, violating the terms of the restraining order, and crossing a street toward the victim paying no attention to the traffic), his asserted state of mind, his observed conduct, his physical condition at the time of the stabbings, and his arguably suicidal attitude following the assault made a jury question of his criminal responsibility.

The jury decide whether there was a reasonable doubt as to the defendant's criminal responsibility unless the issue is not

---

[4] In the *Mattson* case, the defendant based his argument on his personality change during the crime and the bizarre circumstances of the crime.

[5] In the *Laliberty* case, the victims were repeatedly stabbed and their bodies mutilated by a drug-using defendant who had no memory of his conduct, had told the police that he felt strange ("kind of like floating") and testified that he ("felt almost like I was hallucinating").

presented on the evidence. Viewing the evidence most favorably to the defendant, a jury question was presented. It was not a strong case for the defendant. We doubt the jury would have accepted it. It is not our function, however, to foreclose a jury from considering the issue.

*Judgments reversed.*

*Verdicts set aside.*

O'CONNOR, J. (dissenting, with whom Nolan and Lynch, JJ., join). "Although once the [sanity] issue has been raised it is necessary for the prosecution to prove sanity beyond a reasonable doubt, it is not necessary for the prosecution to prove sanity — nor would instructions on the presumption of sanity be appropriate — before the issue is raised." *Commonwealth* v. *Kostka*, 370 Mass. 516, 532 (1976). This case presents the question "how is the sanity issue raised." The question relates not to the burden of persuasion but to the burden of producing evidence. The question is, "What evidence is enough to raise the sanity issue," thus placing on the Commonwealth the burden of proving the defendant's sanity. I understand the court to be saying that the sanity issue may be raised by less evidence than would warrant a finding by a fair preponderance of the evidence that the defendant was insane. I disagree. In my view, the issue is properly raised only if there is evidence introduced by the Commonwealth, the defendant, or both, warranting a finding by a fair preponderance of the evidence that the defendant was insane at the relevant time.

In *Commonwealth* v. *Kostka, supra* at 528 note 11, this court recognized that, in order to raise the sanity issue, "[s]ome jurisdictions require only 'some' or 'slight' evidence of insanity, while others require evidence that raises a 'reasonable doubt' as to the defendant's sanity." The court refrained from placing the Commonwealth in one category or the other. *Commonwealth* v. *Kostka* did not require an election in that regard. However, the court's use of the word "only" to modify the

terms "some" or "slight" evidence is instructive. It makes clear
that the court viewed "some" or "slight" evidence of insanity
as less evidence than evidence that raises a reasonable doubt
as to the defendant's sanity. According to that view, evidence
that does not rise to the level of "some" or "slight" evidence
of insanity surely does not reach the higher level of raising a
reasonable doubt that the defendant was sane.

In *Commonwealth* v. *Laliberty*, 373 Mass. 238, 246-247
(1977), this court stated for the first time: "An insanity defense
may be raised properly by the admission of any evidence which,
if believed, might create a reasonable doubt concerning the
defendant's criminal responsibility at the time of the killings."
In support of that proposition, the court cited *United States* v.
*Currier*, 405 F.2d 1039, 1042 (2d Cir.), cert. denied, 395
U.S. 914 (1969), and A.S. Goldstein, The Insanity Defense
112-113 (1967). *United States* v. *Currier, supra*, does not hold
that the sanity issue is raised by evidence that is insufficient
to warrant a finding of insanity by a fair preponderance of the
evidence. Furthermore, in "The Insanity Defense," Goldstein
writes: "In half the states, the production burden is on the
defendant. He must produce enough to permit a reasonable
jury to conclude that the evidence *preponderates* in favor of
insanity. The production burden having been satisfied, he must
then carry the 'persuasion burden' — that is, he must convince
the jury to find that the preponderance of the evidence is with
him on the issue. In the other half and in the federal courts,
the 'production burden' is initially on the defendant but then
passes to the prosecution. By introducing 'some evidence' of
insanity, the defendant shifts the burden to the prosecution,
which must then present 'sufficient' evidence so that reasonable
men could find the defendant sane beyond reasonable doubt.
The prosecution must also carry the 'persuasion burden,' pro-
ving to the jury beyond a reasonable doubt that the defendant
was sane. There is some dispute, in the second group of juris-
dictions, whether in order to warrant a jury instruction, the
defendant's evidence must raise a reasonable doubt of his san-
ity; or whether something *less* would be sufficient — e.g.,

'some evidence' or 'slight evidence' or 'any evidence'" (emphasis added). *Id.* at 111-112.[1]

Evidence that is insufficient to warrant a finding of insanity by a fair preponderance of the evidence, the most relaxed standard of proof known to the law, cannot be considered "some" or "slight" or "any" evidence of insanity. "Some" or "slight" or "any" evidence of insanity at least "tips the scale" in the direction of insanity enough to warrant a finding that the defendant more likely than not was insane at the time of the alleged crime. As Goldstein put it, the evidence must be "enough to permit a reasonable jury to conclude that the evidence preponderates in favor of insanity." Evidence, as here, of a mere possibility that the defendant was insane does not tip the scale, and therefore is not "some" or "slight" or "any" evidence of insanity. A fortiori, such evidence does not raise a reasonable doubt concerning the defendant's sanity. The court is incorrect in stating that the "dissent espouses a radically new standard for testing whether an instruction on lack of criminal responsibility should be given." *Ante* at 627 note 2. The proposition that a defense, such as lack of criminal responsibility, is not put in issue except by evidence of its probable existence is not new, let alone radically so. Nor is there anything new about the idea that evidence of the possible existence of a defense does not constitute evidence of the defense. Indeed, since the rule the court announces today is that the sanity issue may be raised by evidence that is insufficient to warrant a finding of insanity by a fair preponderance of the evidence, it is difficult to conceive of a case in which the Commonwealth

---

[1] That "some" or "slight" evidence is a lesser quantum of proof than "evidence [raising] a reasonable doubt of . . . sanity" is noted in 1 W.R. LaFave & A.W. Scott, Jr., Substantive Criminal Law § 4.5, at 500 (1986), as follows: "The states are not in agreement on the quantum of evidence which is required to discharge the burden of going forward. The prevailing rule is that the evidence must raise a reasonable doubt of the defendant's mental responsibility for the criminal act. A few jurisdictions, however, appear to require a lesser standard which is sometimes stated as merely 'some evidence,' 'slight evidence,' or a 'scintilla' of evidence." (Footnotes omitted.)

will not have to prove the defendant's sanity and the defendant will not be entitled to an instruction on criminal responsibility if it is requested.[2]

I believe that the court has applied the wrong test in concluding that the sanity issue was raised. Furthermore, I believe that, applying the correct test, the issue was not raised. The evidence does not warrant a finding within the realm of probability (by a fair preponderance of the evidence) that, at the time of the crime, as a result of mental disease or defect, the defendant lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. This court has never defined the words "mental disease or defect" for purposes of the *McHoul* rule,[3] and it is unnecessary to do so here. It is enough to say that anger, jealousy, and frustration, singly or in combination, do not constitute mental disease or defect within the meaning of

---

[2] Furthermore, the mischief of the present decision appears not to be limited to cases involving a question of the defendant's sanity. Just as insanity is a defense, *Commonwealth* v. *Kostka, supra* at 527, 532, which must be raised by evidence of insanity, *id.* at 527-528, there are numerous other defenses, such as self-defense, defense of others, necessity, accident, entrapment and others which appear to be affected by today's decision.

[3] Definition of the words "mental disease or defect" by this court would benefit the administration of justice. By fixing the legal standard against which a defendant's mental condition is to be measured, not only will trial judges and appellate courts on review be better equipped to make the determination whether the evidence warrants submission of the insanity issue to the jury, but jurors themselves will be aided in reaching a final determination. "It is one thing . . . to tolerate and even welcome the jury's sense of equity as a force that affects its application of instructions which state the legal rules that crystallize the requirements of justice as determined by the lawmakers of the community. It is quite another to set the jury at large, without such crystallization, to evolve its own legal rules and standards of justice." *United States* v. *Brawner*, 471 F.2d 969, 989 (D.C. Cir. 1972). The United States Court of Appeals for the District of Columbia Circuit defines "mental disease or defect" as including "any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls." *Id.* at 983, quoting *McDonald* v. *United States*, 312 F.2d 847, 851 (D.C. Cir. 1962). The drafters of the Model Penal Code have acknowledged this definition as consistent with the Code's underlying theory in that it allows for the consideration of developing medical understanding. Model Penal Code § 4.01 comment 5, at 177 (1985).

the rule, and that the record in this case fails to demonstrate that the defendant's act resulted from any mental condition apart from those emotions.

The defendant has no history of treatment for a mental condition. There was no expert testimony supporting his insanity contention. While this court has said that "[i]n an appropriate case the very facts of a crime themselves might be some evidence of the existence of legal insanity," *Commonwealth* v. *Mattson*, 377 Mass. 638, 644 (1979), a comparison of the present case with *Mattson* demonstrates that this is not the type of case to which the court's statement referred. In *Mattson*, the defendant was convicted of assault with intent to murder, assault with intent to rape, and assault and battery with a dangerous weapon. There was evidence that the defendant was a friend of the victim's boy friend, and that the three of them were together at the defendant's apartment on the afternoon of the crime. The defendant and the victim's boy friend left the apartment, and the defendant returned alone a few minutes later and attacked the victim. The victim passed out and, when she regained consciousness, the defendant asked her what had happened. The boy friend returned to the apartment and took the victim to the hospital. The defendant followed them to the hospital, where he was arrested. The victim testified on cross-examination that the defendant appeared "more forward," "louder," and "really different" when he returned alone to the apartment prior to the attack, and that during the attack his voice was "scary loud," his face was "real scary," he was "gritting his teeth" and appeared "wicked mean" and that this was in contrast to his "soft-spoken" "regular" manner throughout the earlier part of the afternoon. The arresting officer testified that, at the hospital, the defendant appeared "normal" and "cooperative." *Id.* at 641-642.

On appeal to this court, the defendant argued that "the circumstances of his crime alone were sufficient to warrant submission of the insanity issue to the jury. He reli[ed] especially on the completely unprovoked 'Jekyll and Hyde' change in his personality from that of the 'soft-spoken' companion of the afternoon to that of the violent attacker, and then back to

the 'cooperative' young man at the hospital who stated to the police that the victim had fallen and hit her head." *Id.* at 643. this court said: "While we agree that these facts are indeed bizarre, and perhaps even in colloquial language might be labelled 'insane,' the defendant's argument misconceives the essential prerequisites of *legal* insanity" (emphasis in original). We affirmed the judgments although the trial judge had refused to instruct the jury on the defense of insanity, as requested, and had sustained the prosecution's objection to the defendant's argument on the issue.

If the facts in *Mattson*, which the court characterized as bizarre, were insufficient to raise the insanity issue, all the more so are the facts int his case insufficient. The facts here are less bizarre than in *Mattson.* Unlike the *Mattson* case, the defendant and the victim in this case had a close relationship, and there was no evidence of an abrupt change in the defendant's manner. The defendant's preassault conduct, consisting of resistance to arrest, disobedience of court orders, and crossing a street without apparent concern for the traffic, only demonstrate his persistent determination to tolerate no obstacles to the continuance of his quarrel with the victim. Nor is the defendant's case advanced by the facts surrounding the attack itself. The facts, to which the defendant testified, that, when he stabbed the victim, his mind went blank, and that he did not want to stab her, show nothing more than that the defendant's anger overcame his good judgment. Those facts, as well as the stiffness of his body while he stabbed the victim and his apparent insensitivity to pain at that time, imply nothing about the defendant's incapacity to appreciate the wrongfulness of his conduct, nor do they permit the inference that he stabbed the victim purusant to an uncontrollable compulsion.

The court appears to find support for its holding in the evidence that, after the attack, the defendant did not remember stabbing the victim, that he told the arresting officer to shoot him and that he wanted the officer to kill him, and that he was extremely emotional, agitated, and shaking in his cell at the police station. Without expert testimony, it would have been unreasonable for the jury to conclude that those occurrences

were anything other than appropriate and normal responses to the trauma that not only the victim, but the defendant as well, had experienced. Indeed, as the court observed in *Commonwealth* v. *McInerney*, 373 Mass. 136, 152 (1977), quoting *Commonwealth* v. *Goldenberg*, 315 Mass. 26, 33 (1943), "[a]n attempt to commit suicide, like an attempt to escape from jail or a flight after the commission of a crime, may indicate the efforts of a guilty person to avoid punishment for his crime."

The result for which I contend is not inconsistent with *Commonwealth* v. *Laliberty*, 373 Mass. 238 (1977), and it finds support not only in *Commonwealth* v. *Mattson, supra*, but also in *Osborne* v. *Commonwealth*, 378 Mass. 104 (1979). In *Laliberty*, this court said that a jury instruction on insanity would have been required if it had been requested. But, the evidence in *Laliberty* included mutilation of the bodies of the elderly victims by a defendant of marginal intelligence who, at the time of the crime, felt strange, "kind of like floating," "almost like . . . hallucinating." *Id.* at 246. *Laliberty* is clearly distinguishable from the instant case. In *Osborne*, on the other hand, we determined that the defendant would not have been entitled to a jury instruction on insanity even if the case had gone to trial and an insanity instruction had been requested, *id.* at 111-113; the defendant was an alcoholic and a Viet Nam veteran who had a history of blacking out. *Id.* at 111 n. 6. He went outside during a blizzard dressed only in light clothing and killed a woman he did not know. *Id.* The defendant did not remember committing the crime and, when he was discovered hiding under an automobile, he said to the police, "How did I get out of bed?" *Id.* If the evidence in *Osborne* was insufficient to raise the issue of the defendant's criminal responsibility, so too was the evidence insufficient in this case. On the basis of both logic and precedent, I would affirm the judgments below.